**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PAYRANGE LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| ALLIANCE LAUNDRY SYSTEMS LLC, | ) |
| | ) |
| Defendant. | ) |

## PAYRANGE LLC'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff PayRange LLC ("PayRange"), by and through the undersigned attorneys, files this Complaint against Defendant Alliance Laundry Systems LLC ("Alliance") and alleges as follows:

## INTRODUCTION

1. PayRange pioneered the mobile payment technology that allows consumers to pay unattended retail machines, such as laundry machines, using a smartphone. After investing tens of millions of dollars in research and development, PayRange built an extensive patent portfolio protecting its mobile payment solutions. Major industry participants have recognized the strength and value of PayRange's portfolio through licenses and settlements. In 2024, PayRange sent Alliance a letter requesting that Alliance take a patent license consistent with what other industry participants had agreed to. Alliance refused to negotiate and instead lashed out with (a) a declaratory judgment action against PayRange alleging non-infringement of a subset of PayRange's patents and (b) four validity challenges with the United States Patent & Trademark Office ("USPTO"). After two of its challenges were summarily dismissed, Alliance lashed out again by purportedly "terminating" PayRange's license to use Alliance's serial interface specification document and threatening customers. As an entrenched legacy player in the route laundry market, Alliance apparently believes that its bullying tactics will force PayRange's

surrender.  Not so.  PayRange has worked too hard for too long to allow Alliance to willfully infringe without consequence.  This lawsuit underscores PayRange's unwavering commitment to protect its innovations, to provide a level playing field for companies that respect intellectual property, and to stop Alliance's blatant and willful patent infringement.

## THE PARTIES

2.      PayRange is a Tennessee corporation with its principal place of business at 9600 NE Cascades Parkway, Suite 280, Portland, Oregon 97220.

3.      On information and belief, Alliance is a limited liability company organized in Delaware with a principal place of business at 221 Shepard Street, Ripon, Wisconsin 54971.

## FACTUAL BACKGROUND

4.      PayRange's acclaimed technology enables its customers to upgrade a coin-operated unattended retail machine into a state-of-the-art mobile payment solution with a small module, called "BluKey."  PayRange's mobile app communicates with BluKey to enable mobile transactions.  The USPTO awarded PayRange a portfolio of patents for its innovations, including U.S. Patent Nos. 12,106,299 (the "'299 Patent") and 12,229,767 (the "'767 Patent") (collectively, the "patents-in-suit").  PayRange's patent portfolio is prominently identified on its website pursuant to PayRange's virtual patent marking practices:  https://payrange.com/patents/.

5.      PayRange found success in the laundry and vending industries, attracting significant customers including WASH.  Unfortunately, competitors took notice and improperly copied PayRange's technology.  As a result, PayRange initiated litigation against a major competitor (KioSoft) and subsequently against KioSoft's major customer (CSC).  In response, KioSoft challenged the validity of PayRange's patents before the USPTO.  PayRange prevailed with confirmed claims in every USPTO challenge that proceeded to a Final Written Decision.

2

6.        On January 31, 2024, PayRange and KioSoft issued a press release announcing a settlement. KioSoft's President, Charles Lee, is quoted:

> *"While we had challenged the PayRange patents vigorously, the Patent Trial and Appeal Board (PTAB) upheld the PayRange patents and, although we disagreed with the result, we must now accept that PayRange has valid claims," stated Charles Lee, President of KioSoft. "We respect the technologies that have helped the self-service industry thrive; and we look forward to continuing to lead innovation and development by providing best-in-class service to our customers with this fully-licensed technology, without any further legal distractions."*

7.        KioSoft agreed to license PayRange's technology for an amount that could exceed $62 million over a ten-year period, dependent on outcomes with a base license of $40 million. PayRange then acquired KioSoft in December 2025.

8.        In April 2024, on the heels of its settlement with KioSoft, PayRange also resolved its patent infringement dispute with KioSoft's customer CSC.

9.        In May 2024, PayRange reached a patent licensing deal with WASH, one of the largest providers of laundry facilities in the United States.  The agreement licenses PayRange's patents for use with the WASH-Connect Mobile Payment App and will continue for the term of PayRange's patents.  In the press release, WASH's CEO, Jim Gimeson stated:

> *"We're a privately held company founded in 1947 and we hold dear our reputation for integrity and ethical practices," says WASH CEO Jim Gimeson. "As operators, we hold a deep respect for the innovations PayRange has brought to elevate the laundry industry."*

10.       In December 2024, PayRange also resolved its patent infringement dispute with Card Concepts Inc. (CCI) by completing a license agreement. In the press release announcing the license, CCI's President, Steve Marcionetti stated:

> *"Our priority at CCI has always been delivering the best possible experience to our customers, and entering into this licensing agreement ensures that we can continue to do just that. By working constructively with PayRange, we have found a path forward that allows both companies to focus on delivering solutions to customers and serve our respective markets with confidence and respect."*

3

11.     In March 2025, PayRange also resolved its patent infringement dispute with Nayax, Ltd.

12.     On March 14, 2024, PayRange sent Alliance a letter providing notice of its infringement and inviting patent licensing discussions.  The letter provided detailed claim charts demonstrating Alliance's infringement of related patents in the same family and placed Alliance on notice of PayRange's patent portfolio and ongoing prosecution activities.  *See* **Exhibit C**.

13.     On April 25, 2024, Alliance sent a response with purported defenses, but Alliance's assertions were meritless.  Moreover, Alliance provided no indication that it would cease infringement, take a license, or even accept PayRange's invitation to meet to discuss the matter.

14.     On May 17, 2024, PayRange responded to Alliance's April 25, 2024 letter, clarifying its position and expressing the intent to seek amicable resolution of the matter. Receiving no substantive response, PayRange sent another letter on June 12, 2024, confirming PayRange's intention to engage in further discussion.

15.     Despite PayRange's successful licensing efforts with other companies in the industry, Alliance refused to take a patent license and instead filed a declaratory judgment action against PayRange on June 20, 2024.  *See Alliance Laundry Systems, LLC v. PayRange LLC*, C.A. No. 24-733-MN, D.I. 1.  Alliance also filed four validity challenges before the USPTO targeting PayRange's patents: two Post-Grant Review petitions filed on January 17, 2025 (PGR2025-00027 and PGR2025-00028), an inter partes review petition filed on February 3, 2025 (IPR2025-00573), and a fourth inter partes review petition filed on April 29, 2025 (IPR2025-00950).

16.     Notwithstanding PayRange's infringement allegations, Alliance continues to infringe PayRange's patented mobile payment solutions and is, in fact, developing and launching new infringing features and products.  For example, on September 4, 2025, Alliance announced

4

the launch of its "Scan-Pay-Wash" product, which, along with Alliance's existing mobile application and payment systems, including Speed Queen and Huebsch products, mobile applications, associated backend servers, and cloud servers (collectively, "Accused Products") infringe PayRange's patents-in-suit.

## JURISDICTION AND VENUE

17.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

18.     This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

19.     Upon information and belief, this Court has personal jurisdiction over Alliance because it is incorporated in the State of Delaware and is therefore subject to personal jurisdiction in this District.

20.     Upon information and belief, Alliance has infringed PayRange's patents-in-suit in this District by, among other things, engaging in infringing conduct within and directed at, or from, this District.  Alliance has purposefully and voluntarily placed one or more of its infringing products, as described below, into the stream of commerce with the expectation that these infringing products will be used in this District.  Alliance's infringing products have been and continue to be used in this District.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b).  Alliance is a Delaware limited liability company that resides in this District.  Additionally, by filing a declaratory judgment action against PayRange, Alliance has conceded that venue is proper in this District.

**PAYRANGE'S PATENTS-IN-SUIT**

22.     To protect its unique and innovative technologies, PayRange filed a provisional patent application (No. 61/917,936) on December 18, 2013.  Several patents issued based on this original application, including the patents-in-suit, as summarized below.

23.     On October 1, 2024, the USPTO issued the '299 Patent, titled "Method and System for Presenting Representations of Payment Accepting Unit Events."  A true and correct copy of the '299 Patent is attached hereto as **Exhibit A**.

24.     On February 18, 2025, the USPTO issued the '767 Patent, titled "Method and System for Presenting Representations of Payment Accepting Unit Events."  A true and correct copy of the '767 Patent is attached hereto as **Exhibit B**.

**COUNT I - INFRINGEMENT OF THE '299 PATENT**

25.     PayRange realleges and incorporates the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

26.     PayRange is the assignee and owner of all right, title, and interest in and to the '299 Patent.  PayRange has the exclusive right to make, use, sell, and offer to sell any product embodying the '299 Patent throughout the United States, and to import any product embodying the '299 Patent into the United States.

27.     On August 2, 2024, during prosecution of the application that issued as the '299 Patent, the patent examiner issued a Notice of Allowance.  In so doing, the patent examiner identified the following limitations appearing across the independent claims that "the prior art taken alone or in combination failed to teach or disclose":

> *after establishing the wireless communication path, enabling user interaction with the user interface of the mobile payment application to complete a transaction with the available payment accepting unit, wherein completing the transaction causes an authorization grant to pass from the server to the available payment accepting*

6

*unit, wherein the user interface includes a visual representation of the available payment accepting unit, an indication of a balance, and an affordance that, in response to a user input, indicates completion of the transaction, exchanging information with the available payment accepting unit via the one or more radio transceivers, in conjunction with the transaction; and after exchanging the information, displaying, on the display, an updated user interface of the mobile payment application to a user of the mobile device[.]*

Notice of Allowance at 2.

28.     The patent examiner also concluded that "[t]he above recited limitations provide meaningful limitations that transform the abstract idea into patent eligible.  The claims as a whole effect an improvement to another technology or technical field.  These limitations in combination provide meaningful limitations beyond generally linking the use of the abstract idea to a practical application." *See id.* at 4.  In reaching these conclusions, the patent examiner referenced U.S. Publication No. 20180374076 by Wheeler ("Wheeler") and U.S. Publication No. 20210056552 by Murray ("Murray").

29.     With respect to Wheeler, the patent examiner stated that it "discloses a system and method for performing automated operations to identify one or more computing devices associated with potential payees that are within a defined proximity of a user mobile device[,]" including retrieving and displaying information about identified payees for possible selection, and initiating payments to a selected payee.  Notice of Allowance at 4.

30.     With respect to Murray, the patent examiner stated that it "discloses a method and apparatus for allowing a customer or payor to select from a plurality of nearby vendors or payees when a computing device of the payor is physically close to electronic devices of the payees," and that after a product or service has been provided, confirmation information may be sent to the selected payee device. *Id.*

31.     The '299 Patent is a significant departure from Wheeler and Murray.  Both Wheeler and Murray describe systems that identify nearby people or merchants as potential payees—they

7

are oriented toward peer-to-peer or retail payment flows between human participants.  Neither discloses a system in which the user's mobile device interacts with an unattended payment accepting unit, such as a laundry machine, by establishing a wireless communication path and enabling the user to complete a transaction through a mobile payment application interface.  The '299 Patent addresses this distinct technological challenge by, among other things, enabling the mobile payment application to present a user interface that includes a visual representation of the available payment accepting unit, an indication of the user's balance, and an affordance that triggers completion of the transaction, causing an authorization grant to pass from a remote server to the payment accepting unit, followed by an updated user interface confirming the completed transaction.  This was an unconventional solution absent from the prior art.

32.    Significant advantages of the '299 Patent over prior art approaches include: completing a transaction through a mobile application interface that causes an authorization grant to pass directly from a server to the payment accepting unit; presenting the user with a real-time visual representation of the specific machine being used, together with an account balance and a transaction affordance; and displaying an updated user interface after information is exchanged with the machine.  These advantages were not routine, well-understood, or conventional, especially when considered in combination.

33.    The specification further explains that this approach provides practical technological benefits over prior systems because the mobile device can identify specific payment accepting units available in proximity to the user, establish a wireless communication path connecting the mobile device, a server, and the selected unit, and present a streamlined transaction interface, including a visual representation of the unit, an indication of the balance due, and an affordance to complete the transaction, that causes an authorization grant to pass from the server

directly to the payment accepting unit upon completion. By enabling the user's mobile device to serve as the transaction interface while routing authorization through a server to the machine, the invention addresses the technological challenge of determining which specific payment accepting unit to interact with among many potential options, without requiring modifications to the payment accepting units themselves. Accordingly, the claims of the '299 Patent contain inventive concepts and were not well-understood, routine, or conventional.

34. Upon information and belief, Alliance has infringed and continues to infringe at least claims 1-3, 5-8, 10, and 12-20 of the '299 Patent in this District and elsewhere in the United States, by, among other things, directly or through intermediaries, making, using, selling and/or offering for sale products such as the Accused Products, covered by one or more claims of the '299 Patent to the injury of PayRange. Alliance is directly infringing, literally infringing, and/or infringing the '299 Patent under the doctrine of equivalents. Alliance is thus liable for infringement of the '299 Patent pursuant to 35 U.S.C. § 271(a).

35. The Accused Products include the Speed Queen and Huebsch apps, which execute on users' Android or iPhone devices, each of which includes one or more processors, memory, one or more output devices including a display, and one or more radio transceivers, including cellular, Wi-Fi, and Bluetooth transceivers. Alliance makes both apps available for download on the Google Play Store and the Apple App Store, each with over 100,000 downloads and promotes their use by laundry facility operators and end-users. For example, Alliance's app store listings and instructional materials depict the Speed Queen and Huebsch apps operating on Android and iPhone devices to conduct mobile payment transactions with washers and dryers at laundry facilities.

9

36.    The Speed Queen and Huebsch apps identify one or more payment accepting units that are available to accept payment from the mobile payment application executing on the mobile device, based at least in part on an identifier corresponding to those units. Specifically, both apps identify available washers and dryers at a laundry facility and display them to the user with numerical identifiers — such as "Washer 0051" or "Dryer 0101" — that correspond to specific machines. Those washers and dryers are payment-operated machines that accept payment for laundry services. Both apps further display a user interface on the mobile device showing those available units and accept user input to select a specific machine for a transaction.

37.    Upon information and belief, after a user selects a machine, both apps establish via the mobile device's radio transceivers a wireless communication path connecting the mobile device, Alliance's cloud servers, and the selected payment accepting unit. Alliance's instructional materials confirm that both apps communicate with washers and dryers via a cellular or Wi-Fi connection through Alliance's servers to initiate and process laundry transactions. This wireless communication path satisfies the claimed requirement of a path "including the mobile device, a server, and the available payment accepting unit."

38.    After establishing the wireless communication path, both apps enable user interaction with the user interface to complete a transaction with the selected machine, wherein completing the transaction causes an authorization grant to pass from Alliance's server to the available payment accepting unit. The transaction interface displayed by both apps includes a visual representation of the selected machine (e.g., "Washer 0051" or "Washer 0101"), an indication of the balance due, and a "Pay" button that, in response to user input, indicates completion of the transaction. Upon activation of the "Pay" button, Alliance's server transmits an authorization grant to the selected washer or dryer to initiate the laundry cycle. Alliance's

10

promotional and instructional materials confirm that pressing "Pay" causes the machine to start. The "Pay" button satisfies the claimed affordance either literally or under the doctrine of equivalents. Upon information and belief, both apps then exchange information with the selected machine via the mobile device's radio transceivers in conjunction with the transaction, and thereafter display an updated user interface, including an "in use" screen showing the machine's status and remaining cycle time, to the user. Accordingly, the Speed Queen and Huebsch apps satisfy each limitation of at least claim 1 of the '299 Patent, either literally or under the doctrine of equivalents.

39.    Alliance has known of the existence of the '299 Patent since at least May 29, 2026, when PayRange sent Alliance a letter alleging that the Accused Products infringed the '299 Patent, and Alliance's acts of infringement have been willful and in disregard for the '299 Patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct. Additionally, at least since receiving PayRange's March 14, 2024 letter, Alliance has willfully blinded itself to the '299 Patent by, on information and belief, avoiding reviewing or investigating PayRange's patent portfolio despite clear indications that one or more of the patents might cover the Accused Products. On information and belief, Alliance knew that there was a high likelihood its products infringed the '299 Patent but consciously chose to proceed with offering the Accused Products anyway.

40.    Alliance actively encourages its business partners, end-users and/or customers to, for instance, use the Accused Products in an infringing manner. Alliance encourages infringement with a specific intent to cause its business partners and customers to infringe. Alliance's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b).

11

41.     To the extent Alliance payment systems that are compatible with Speed Queen and Huebsch mobile apps, without more, does not directly infringe at least the above-identified claims of the '299 Patent, Alliance contributes to infringement of the same under 35 U.S.C. § 271(c) inasmuch as the Accused Products are components of a patented machine or an apparatus used in practicing a patented process, constituting a material part of PayRange's invention, knowing the same to be especially made or especially adapted for use in infringement of the '299 Patent.

42.     Alliance's direct infringement, contributory infringement, and inducement of infringement have irreparably harmed PayRange.  On information and belief, PayRange has lost prospective customers and was forced to compete against its own technology, at least in part, due to Alliance's infringement.  The continued infringement harms PayRange's reputation in the marketplace and discourages other potential customers from purchasing PayRange's solutions. These reputational and business harms cannot be adequately remedied by monetary compensation.

43.     Upon information and belief, Alliance will continue to infringe the '299 Patent unless enjoined.

44.     Pursuant to 35 U.S.C. § 284, PayRange is entitled to damages adequate to compensate for the infringement, including a reasonable royalty and/or lost profits.

45.     This case is "exceptional" within the meaning of 35 U.S.C. § 285, and PayRange is entitled to an award of attorneys' fees.

**COUNT II - INFRINGEMENT OF THE '767 PATENT**

46.     PayRange realleges and incorporates the allegations of the preceding paragraphs of this complaint as if fully set forth herein.

47.     PayRange is the assignee and owner of all right, title, and interest in and to the '767 Patent.  PayRange has the right to make, use, sell, and offer to sell any product embodying the

'767 Patent throughout the United States, and to import any product embodying the '767 Patent into the United States.

48.    On August 10, 2024, during prosecution of the application that issued as the '767 Patent, the patent examiner issued a Notice of Allowance.  In so doing, the patent examiner noted that the prior art taken alone or in combination failed to teach or suggest:

> *displaying a user interface of a mobile payment application on the display of the mobile device, the user interface being configured to display a visual indication of the one or more payment accepting units and accept user input to (i) receive selection by a user of the mobile device of an available payment accepting unit of the one or more payment accepting units and (ii) trigger payment by the mobile payment application for a transaction initiated by the user of the mobile device with the available payment accepting unit of the one or more payment accepting units[;]*
>
> *establishing via the one or more radio transceivers a wireless connection involving the mobile device and the available payment accepting unit of the one or more payment accepting units;*
>
> *after establishing the wireless connection, enabling user interaction with the user interface of the mobile payment application to complete the transaction, wherein completing the transaction causes an authorization grant to pass to the available payment accepting unit, wherein the authorization grant causes a credit to be displayed at the available payment accepting unit enabling user selection of a product or service provided by the available payment accepting unit[;]*
>
> *exchanging information with the available payment accepting unit via the one or more radio transceivers, in conjunction with the transaction[;] and*
>
> *in response to receiving the information, displaying, on the display, an updated user interface of the mobile payment application to the user of the mobile device[.]*

Notice of Allowance at 4.

49.    The patent examiner also concluded that "[t]he above recited limitations provide meaningful limitations that transform the abstract idea into patent eligible.  The claims as a whole effect an improvement to another technology or technical field.  These limitations in combination provide meaningful limitations beyond generally linking the use of the abstract idea to practical

13

application." *See id.* at 5.  In reaching these conclusions, the patent examiner referenced Wheeler and Murray.  *Id.* at 5-6.

50.     As described by the patent examiner, Wheeler involves "a system and method for performing automated operations to identify one or more computing devices associated with potential payees that are within a defined proximity of a user mobile device.  A processor-based computing system retrieves stored photographic and biographic information regarding the identified potential payees, and displays the retrieved photographic and biographic information for possible selection by a user of the mobile device.  One or more payments from the user of the mobile device may be specified and initiated via the processor-based computing system to potential payees selected by the user, including for partial or full payment of a customer order of the user with a merchant associated with an identified point-of-sale computing system." *Id*. at 5.

51.     The '767 Patent is also distinguishable from Murray.  The patent examiner stated that Murray discloses "a method and apparatus for allowing a customer or payor to select from a plurality of nearby vendors or payees when a computing device of the payor is physically close to electronic devices of the payees.  Payee devices and locations of those payee devices may be identified and displayed on a display of a payee device.  Once displayed, a specific payee device may be selected by the customer and an order for a product or service may be sent to the selected payee device from the payor device.  After the product or service has been provided to the customer, information that confirms that purchase may be sent to any of the selected payee device." *Id.* at 5-6.

52.     The '767 Patent represents a significant departure from Wheeler and Murray.  Both Wheeler and Murray describe systems that identify nearby people or merchants as potential payees—they are oriented toward peer-to-peer or retail payment flows between human

14

participants.  Neither discloses a system in which the user's mobile device interacts with an unattended payment accepting unit, that "accept[s] payment for dispensing of products and/or services[,]" such as a vending machine or laundry machine, by establishing a wireless communication path and enabling the user to complete a transaction through a mobile payment application interface.  *See* '767 Patent, Cl. 16.  Using a mobile device to identify payment accepting unit based on an identifier or location was an unconventional approach.

53.    The '767 Patent also claims "displaying a user interface of the mobile payment application on the display of the mobile device, the user interface being configured to display a visual indication of the one or more payment accepting units and accept user input to (i) receive selection by a user of the mobile device of an available payment accepting unit of the one or more payment accepting units and (ii) trigger payment by the mobile payment application for a transaction initiated by the user of the mobile device with the available payment accepting unit" and, in response to receiving information from the payment accepting unit, "displaying, on the display, an updated user interface of the mobile payment application to the user of the mobile device."  '767 Patent, Cl. 1.  Neither Wheeler nor Murray teaches this two-step user interaction model—first selecting a specific unattended machine, then separately triggering payment — combined with an authorization grant that causes a credit to be displayed at the machine and an updated user interface returned to the mobile device in response to information received from the machine.  This confirms that the '767 Patent was not well-understood, routine, or conventional.

54.    The '767 Patent also claims "an authorization grant . . . [that] causes a credit to be displayed at the available payment accepting unit enabling user selection of a product or service provided by the available payment accepting unit[.]" '767 Patent, Cl. 16.  Both Wheeler and

Murray only disclose the amount to be paid to the payee but are otherwise silent on displaying any credit.

55.    A significant advantage of the '767 Patent is the ability to identify payment accepting units based on the location or identifier corresponding to the payment accepting units that are available to accept payment.  Another significant advantage is that completing the transaction causes an authorization grant to pass to the available payment accepting unit, wherein the authorization grant causes a credit to be displayed at the machine enabling the user to select a product or service directly on the machine.  Displaying an updated user interface to the user in response to receiving information from the machine following the transaction is yet another significant advantage.

56.    Upon information and belief, Alliance has infringed and continues to infringe at least claims 1-6, 10-13, and 16-20 of the '767 Patent in this District and elsewhere in the United States, by, among other things, directly or through intermediaries, making, using, selling and/or offering for sale Accused Products, covered by one or more claims of the '767 Patent to the injury of PayRange.  Alliance is directly infringing, literally infringing, and/or infringing the '767 Patent under the doctrine of equivalents.  Alliance is thus liable for infringement of the '767 Patent pursuant to 35 U.S.C. § 271(a).

57.    Alliance has known of the existence of the '767 Patent since at least May 29, 2026, when PayRange sent Alliance a letter alleging that the Accused Products infringed the '767 Patent, and Alliance's acts of infringement have been willful and in disregard for the '767 Patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct. Additionally, at least since receiving PayRange's March 14, 2024 letter, Alliance has willfully blinded itself to the '767 Patent by, on information and belief, avoiding reviewing or investigating

16

PayRange's patent portfolio despite clear indications that one or more of the patents might cover the Accused Products. On information and belief, Alliance knew that there was a high likelihood its products infringed the '767 Patent but consciously chose to proceed with offering the Accused Products anyway.

58. Alliance has directly infringed, and continues to directly infringe, at least claim 1 of the '767 Patent by making, using, offering for sale, selling, and/or importing systems and devices that practice the claimed method of executing payment accepting unit events, including the Accused Products. The Accused Products include the Speed Queen and Huebsch apps, which execute on users' Android or iPhone devices, each of which includes one or more processors, memory, one or more output devices including a display, and one or more radio transceivers, including cellular, Wi-Fi, and Bluetooth transceivers. Alliance makes both apps available for download on the Google Play Store and the Apple App Store, each with over 100,000 downloads, and promotes their use by laundry facility operators and end-users. For example, Alliance's app store listings and instructional materials depict the Speed Queen and Huebsch apps operating on Android and iPhone devices to conduct mobile payment transactions with washers and dryers at laundry facilities.

59. The Speed Queen and Huebsch apps identify one or more payment accepting units that are available to accept payment from the mobile payment application executing on the mobile device, based at least in part on an identifier corresponding to those units. Specifically, both apps identify available washers and dryers at a laundry facility and display them to the user with numerical identifiers — such as "Washer 0051" or "Dryer 0101" — that correspond to specific machines. Those washers and dryers are payment-operated machines that accept payment for laundry services. Both apps further display a user interface on the mobile device showing those

17

available units, configured to accept user input to (i) receive selection of a specific machine and (ii) trigger payment for a transaction initiated by the user with that machine.

60.    Upon information and belief, after a user selects a machine, both apps establish via the mobile device's radio transceivers a wireless connection involving the mobile device and the selected payment accepting unit.  Alliance's instructional materials confirm that both apps communicate with washers and dryers via a cellular or Wi-Fi connection to initiate and process laundry transactions.

61.    After establishing the wireless connection, both apps enable user interaction with the user interface to complete the transaction with the selected machine, wherein completing the transaction causes an authorization grant to pass to the available payment accepting unit.  Upon information and belief, the authorization grant causes a credit to be displayed at the selected washer or dryer, enabling user selection of a laundry cycle or service directly on the machine.  Alliance's promotional and instructional materials confirm that upon completion of the payment transaction through the app, the selected machine is enabled to start a laundry cycle.  Upon information and belief, both apps then exchange information with the selected machine via the mobile device's radio transceivers in conjunction with the transaction, and, in response to receiving that information, display an updated user interface, including an "in use" screen showing the machine's status and remaining cycle time, to the user.  Accordingly, the Speed Queen and Huebsch apps satisfy each limitation of at least claim 1 of the '767 Patent, either literally or under the doctrine of equivalents.

62.    Alliance actively encourages its business partners and/or customers to, for instance, use the Accused Products in an infringing manner.  Alliance encourages infringement with a

specific intent to cause its business partners and customers to infringe. Alliance's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b).

63.     To the extent Alliance payment systems that are compatible with Speed Queen and Huebsch mobile apps, without more, do not directly infringe at least the above-identified claims of the '767 Patent, Alliance contributes to infringement of the same under 35 U.S.C. § 271(c) inasmuch as the Accused Products are components of a patented machine or an apparatus used in practicing a patented process, constituting a material part of PayRange's invention, knowing the same to be especially made or especially adapted for use in infringement of the '767 Patent.

64.     Alliance's direct infringement, contributory infringement, and inducement of infringement have irreparably harmed PayRange. On information and belief, PayRange has lost prospective customers and was forced to compete against its own technology, at least in part, due to Alliance's infringement. The continued infringement harms PayRange's reputation in the marketplace and discourages other potential customers from purchasing PayRange's solutions. These reputational and business harms cannot be adequately remedied by monetary compensation.

65.     Upon information and belief, Alliance will continue to infringe the '767 Patent unless enjoined.

66.     Pursuant to 35 U.S.C. § 284, PayRange is entitled to damages adequate to compensate for the infringement, including a reasonable royalty and/or lost profits.

67.     This case is "exceptional" within the meaning of 35 U.S.C. § 285, and PayRange is entitled to an award of attorneys' fees.

### REQUEST FOR RELIEF

WHEREFORE, PayRange requests that the Court find in its favor and against Alliance, and that the Court grant PayRange the following relief:

a.  Judgment that Alliance infringes the patents-in-suit;

b.  Judgment that Alliance is liable for infringement of the patents-in-suit.

c.  That PayRange be granted injunctive relief against Alliance and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, to prevent the recurrence of the infringing activities complained of herein, including an injunction against further installations of infringing payment modules and removing all infringing mobile apps from all third party app stores such as the Google Play Store and Apple App Store, and for all further proper injunctive relief pursuant to 35 U.S.C. § 283;

d.  Judgment that Alliance account for and pay to PayRange all damages and costs incurred by PayRange, caused by Alliance's infringing activities complained of herein;

e.  Judgment that Alliance willfully infringed and that the damages award to PayRange be increased up to three times the amount assessed, pursuant to 35 U.S.C. § 284;

f.  That PayRange be granted pre-judgment and post-judgment interest on the damages;

g.  That this Court declare this an exceptional case and award PayRange reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

h.  That PayRange be granted such other and further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of this action.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

James C. Yoon
Ryan R. Smith
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Tel:  (650) 493-9300

Jamie Y. Otto
Jiayue (Angelina) He
WILSON SONSINI GOODRICH & ROSATI P.C.
953 East Third Street, Suite 100
Los Angeles, CA 90013
Tel:  (323) 210-2900

Dated: June 1, 2026
12951060 / 23372.00005

By:  */s/ David E. Moore*
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com

*Attorneys for Plaintiff PayRange LLC*

21